**BUCON, INC., Appellant,**

v.

**DIRECTOR OF REVENUE, STATE OF MISSOURI, Respondent.**

No. 80359.

Supreme Court of Missouri, En Banc.

June 16, 1998.

As Modified on Denial of Rehearing Aug. 25, 1998.

*v. Multistate Tax Comm'n*, 434 U.S. 452, 473 n. 25, 98 S.Ct. 799, 54 L.Ed.2d 682 (1978).

Peter F. Daniel, Thomas J. McMahon, Kansas City, William K. Waugh, III, Overland Park, Kan., for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Edward F. Downey, Asst. Atty. Gen., Michael Murray, Mo. Dept. of Revenue, Jefferson City, for Respondent.

WHITE, Judge.

In this case we are called upon to decide whether a contract for the construction of an improvement on real property is a "transaction involving the sale of tangible property" under section 143.451.2,[1] allowing income from the transaction to be treated as arising from wholly outside the state, even where substantial direction and support of the contract activities were conducted from a Missouri headquarters. Because we agree with the Administrative Hearing Commission's conclusion that the contracts at issue were service contracts not involving the sale of property, the decision is affirmed.

The parties attempt to invoke this Court's exclusive appellate jurisdiction under article V, section 3 of the Missouri constitution. While, as this Court has recently held, this provision of the constitution does not apply to review of decisions of the AHC, this case involves the construction of a revenue law, and the issues it raises are of considerable interest to Missouri taxpayers in the construction industry. Accordingly, the matter is appropriate for transfer by this Court, prior to opinion of the court of appeals.

### Factual and Procedural Background

Bucon, Inc., a Delaware corporation which does business under the name "Butler Construction," is wholly-owned by, and bills itself as, "the construction subsidiary" of Butler Manufacturing Company. Butler Manufacturing makes components of "pre-engineered" commercial buildings, commonly known as "Butler Buildings." While these products are generally sold through an independent network of distributors, Butler formed Bucon to give its customers the option to have their buildings designed and built by one company, in particular, where the project is too large for a local builder, or where a customer wishes to construct a number of similar buildings nationally. Bucon's home office (including, *inter alia*, its engineering department, two salespersons, a sales executive, and a field operations manager) is located in Kansas City, Missouri. Bucon has two out-of-state salespersons who work from their homes, and do not have authority to enter contracts on behalf of Bucon. Bucon's Kansas City-based project managers draft these contracts, track progress of their performance, and supervise Bucon's on-site superintendents, who travel from job to job and are not based in a particular location. None of the components (for out-of-state projects) are manufactured, stored in, or shipped from Missouri.

Bucon's operations consist of three types of contracts, which involve varying degrees of company involvement in the construction of the Butler Building. In a "materials-only" contract, Bucon supplies the Butler products, but does not otherwise participate in the construction of the building. The Director did not challenge Bucon's characterization of income from "materials-only" contracts as completely without the state under section 143.451.2(3), and, hence, these contracts are not at issue in this case.

In a "materials-erect" contract, Bucon agrees to supervise the construction of the metal structure of the building, in addition to providing all materials necessary for that construction, including Butler structural components. Bucon generally hires the subcontractors who actually perform the construction under the supervision of a Bucon superintendent. In these contracts, Bucon typically agrees to be totally responsible for the "supervision, welfare, and compensation of employees," and "for any work performed by [Bucon's] employees or subcontractors." The building owner contracts out the mechanical, electrical, and architectural finish work to other contractors. Materials manufactured by Butler Manufacturing generally account for 50 to 70 percent of the cost of a materials-erect project.

1. Unless otherwise noted, all statutory citations are to RSMo 1994.

In "turnkey" or "design/build" contracts, Bucon is the general contractor and is responsible for all construction, and, in some cases, also for the design of these buildings. In rare instances, Bucon will perform a design/build contract on a project that does not use Butler-manufactured products. Butler Manufacturing products generally comprise 10 to 15 percent of the cost of a turnkey contract.

For tax years 1985 through 1991, Bucon elected to apportion its income using the single-factor apportionment formula under section 143.451.2(2):

> (2) The taxpayer may elect to compute the portion of income from all sources in this state in the following manner:
>
> . . . .
>
> (b) . . . [T]he amount of business transacted wholly in this state shall be added to one-half of the amount of business transacted partly in this state and partly outside this state and the amount thus obtained shall be divided by the total amount of business transacted, and the net income shall be multiplied by the fraction thus obtained, to determine the proportion of income to be used to arrive at the amount of Missouri taxable income. The investment or reinvestment of its own funds, or sale of any such investment or reinvestment, shall not be considered as sales or other business transacted for the determination of said fraction.

Section 143.451.2(3) specifies the treatment accorded certain sales transactions:

> (3) For the purposes of this section, a transaction involving the sale of tangible property is:
>
> (a) **"Wholly in this state"** if both the seller's shipping point and the purchaser's destination point are in this state;
>
> (b) **"Partly within this state and partly without this state"** if the seller's shipping point is in this state and the purchaser's destination point is outside this state, or the seller's shipping point is outside this

state and the purchaser's destination point is in this state;

> (c) Not **"wholly in this state"** or not **"partly within this state and partly without this state"** only if both the seller's shipping point and the purchaser's destination point are outside this state. . . .

Bucon took the position that income produced from these contracts falls under section 143.451.2(3).[2] The Director disagreed, and assessed a deficiency for the years 1985–87 and 1989–91. The AHC held that this was not a "transaction involving the sale of tangible property," but rather a contract for construction services, and held that, since a large part of the supervisory and design work supporting the construction contracts took place in Missouri, the source of this income was partially within and partially without the state.[3]

### Transaction Involving the Sale of Tangible Property

This Court is bound to uphold the decision of the AHC if it is "authorized by law and supported by competent and substantial evidence upon the whole record. . . ."[4] Bucon does not challenge the AHC's conclusion that, under the general "source of income" rule, this income is partially derived from sources within the state. Rather, Bucon focuses its argument on its contention that the allocation rule now in subparagraph (3) applies. Nor does Bucon appear to claim that it sold personal property to its customers under the turnkey and materials-erect contracts. Instead, Bucon notes that the provision does not limit its reach to personal property, and refers to all "tangible property," which Bucon claims to sell under these contracts.

While the taxpayer and the Director focus their arguments largely on the issue of whether "tangible property" includes only "tangible personal property," this question was not decided below. Instead, the AHC properly focused on the threshold question of

2. Formerly codified at section 144.010(7), RSMo 1986.

3. *See e.g., J.C. Nichols Co. v. Director of Revenue,* 796 S.W.2d 16, 17–18 (Mo. banc 1990); *Bank*

*Bldg. & Equip. Corp. v. Director of Revenue,* 687 S.W.2d 168, 171 (Mo. banc 1985).

4. Section 621.193.

whether the particular transactions at issue here involved a sale of tangible property, an issue on which Bucon bore the burden of proof.[5] To this end, Bucon produced several contracts it said were representative of its material-erect and turnkey operations. While Bucon's brief argues that it "transferred ownership of title and property to a customer in return for money," these contracts refute Bucon's characterization of the transactions.

For instance, the contract relating to the Wal–Mart distribution center, introduced by Bucon as exemplary of its materials-erect agreements (and which is quite similar in structure to the example Design/Build contract offered by Bucon) does not concern itself with issues of the transfer of title; instead, it is couched as a service contract. The contract is titled "Construction Agreement Between Owner and Contractor," and subtitled "Construction Contract." In the agreement, Bucon undertakes to perform "the Work," that is, "furnishing all engineering design, labor, equipment, material, insurance, applicable taxes, and proper documentation necessary to complete the metal building construction ..." on the owner's property. Crucially, Bucon agrees to "provide and *pay for* all labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for the proper execution and completion of the work ...." (emphasis supplied). While Bucon explicitly warrants that all work performed under the contract is free from defects, it "does not guarantee manufactured material and equipment," which must be guaranteed from the suppliers of those items. Where issues of ownership are mentioned all, the provisions do not suggest a transfer of ownership, but rather that the goods remain the property of Bucon. For instance, if Bucon breaches the contract, the owner has the right to terminate the contract and complete the work itself, including taking possession of the site and "all materials equipment tools, construction equipment and machinery thereon owned by" Bucon. Bucon is entitled to reimbursement for the cost of the work plus a lump sum, up to a maximum amount.

Taxpayers are free to structure a transaction as they wish. Perhaps Bucon could, conceivably, have structured its agreements in such a way as to have them involve a sale of tangible property under 143.451.2(3). But the provisions of the agreements presented by the taxpayer here strongly support the conclusion that the object of these transactions was the performance of construction work, that is, construction services, and not the transfer of ownership in tangible property. Accordingly, the AHC's conclusion that the transactions entered into by Bucon were contracts for services, and not sales, is supported by competent and substantial evidence on the whole record, and Bucon was not entitled to apportion all income arising from those transactions as wholly without the State under 143.451.2(3).

The decision of the Administrative Hearing Commission is affirmed.

BENTON, C.J., and LIMBAUGH, ROBERTSON, COVINGTON and HOLSTEIN,JJ., and RICHARD B. TEITELMAN, Special Judge, concur.

PRICE, J., not sitting.

WOLFF, J., not participating because not a member of the Court when the cause was submitted.